**ARMOUR AND COMPANY, Appellant,**

**v.**

**Orville L. FREEMAN, Secretary of Agriculture, et al., Appellees.**

**No. 16723.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 15, 1961.

Decided Feb. 8, 1962.

Certiorari Denied June 11, 1962. See 82 S.Ct. 1559.

Mr. Thomas F. Daly, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Harry A. Inman, Washington, D. C., was on the brief, for appellant.

Mr. John G. Laughlin, Jr., Department of Justice, with whom Asst. Atty. Gen., William H. Orrick, Jr., and David C. Acheson, U. S. Atty., were on the brief, for appellees. Messrs. Nathan J. Paulson and Abbott A. Leban, Asst. U. S. Attys., also entered appearances for appellees.

Mr. Harry A. Inman, Washington, D. C., filed a brief on behalf of Swift & Company, et al., as amici curiae, urging reversal.

Before WILBUR K. MILLER, Chief Judge, and PRETTYMAN and DANAHER, Circuit Judges.

## WILBUR K. MILLER, Chief Judge.

Armour and Company filed suit November 6, 1961, in the United States District Court against Orville L. Freeman, Secretary of Agriculture,[1] asking the court to enjoin the Secretary from enforcing, and to declare invalid, an amendment to his regulations issued October 13, 1961, effective November 17, 1961. Admittedly, the amendment has the effect of requiring Armour and Company and other packers who process meats in federally inspected plants to affix the label IMITATION HAM to smoked hams containing added moisture content up to 10 per cent of their "green" or uncured weight,[2] although the addition of moisture to that extent is permitted, if the ham is so labeled. Armour charged the Secretary was arbitrary and capricious in promulgating the amended regulation in that, inter alia, he thereby required it to violate the Meat Inspection Act[3] which provides that "[N]o such meat or meat food products shall be sold or offered for sale by any person, firm, or corporation in interstate or foreign commerce under any false or deceptive name * * *."

Armour moved for a preliminary injunction and the appellees moved for summary judgment. At the hearing on the motions it was made to appear that

---

1. M. R. Clarkson, Acting Administrator of the Department's Agricultural Research Service, was also sued.

2. The regulation concerning the use of the word IMITATION in the labeling of food products, which the challenged amendment made applicable to moist hams, is 9 C.F.R. § 17.8(b) (1959). It is as follows:

    "(b) A label for product which is in imitation of another food shall bear the word 'imitation' immediately preceding the name of the food imitated and in the same size and style of lettering as in that name and immediately thereafter the word 'ingredients' and the names of the ingredients arranged in the order of their predominance."

3. Act of March 4, 1907, ch. 2907, 34 Stat. 1260, 21 U.S.C.A. §§ 74, 75. The language quoted above is in § 75.

the modern curing process involves the addition of moisture to smoked pork products and that hams so treated are wholesome and healthful food having higher nutritional value than those to which the curing solution has not been added.

After making findings of fact, the District Court concluded "There is a genuine issue of material fact as to whether or not the Secretary of Agriculture * * * acted in an arbitrary and capricious manner in adopting the amendments here in issue." It also concluded Armour would not suffer irreparable injury from the denial of its motion for a preliminary injunction and that the public interest would be adversely affected if such an injunction were granted. Consequently, an order was entered denying the Secretary's motion for summary judgment and also denying Armour's motion for a preliminary injunction. Armour appeals.

■ On consideration of the papers before us, we think it was clearly error to deny Armour's motion for a preliminary injunction.[4] The Secretary's amendatory regulation which is under attack, is capricious and arbitrary on its face in requiring a packer to label a genuine ham as IMITATION HAM, thus forcing him into violating the statute which forbids misbranding; and nothing in the record as presently constituted supports or justifies such an enforced distortion of the truth. The Secretary could easily have made this litigation unnecessary by merely requiring that labels on moist hams bear a legend showing the nature and extent of the added moisture. Instead, he chose to require the false and deceptive IMITATION HAM label.

Irreparable injury to Armour from the enforcement of the regulation is apparent without demonstration, for the attempted marketing of meat products thus officially required to be grossly misbranded could not fail to damage its good name. Withdrawal from the interstate market—

Armour's only other alternative—would of course cause loss of profits which could never be recaptured.

We see nothing in the record before us to indicate the public interest would be adversely affected by the grant of a preliminary injunction. The requirements of the Virginia Petroleum Jobbers case[5] with respect to a preliminary injunction were fully met by Armour. Upon remand, such an injunction should be entered. Thereupon, the appellees will of course have an opportunity to plead in justification of their position, and to introduce proof on the issues formed by the pleadings.

Reversed and remanded.

On Appellees' Motion for an En Banc Rehearing of Motion to Extend Time to File Petition for Rehearing.

Mr. John G. Laughlin, Jr., Atty., Dept. of Justice, was on the motion for appellees.

Mr. Harry A. Inman, Washington, D. C., was on the opposition for appellant.

Before WILBUR K. MILLER, Chief Judge, and EDGERTON, PRETTYMAN, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, in Chambers.

ORDER—Filed April 2, 1962

PER CURIAM.

This cause came on for consideration of appellees' motion for en banc rehearing of their motion to extend the time fixed by our Rule 26, 28 U.S.C.A., within which they might file a petition for rehearing, an extension having theretofore been denied by the Chief Judge after consideration of the motion and appellant's opposition thereto. It appearing to the court that no valid reason has been shown for the extension sought, and that an extension would be unfair to the appellant, it is

4. Cox v. Democratic Central Committee, 91 U.S.App.D.C. 416, 200 F.2d 356 (1952).

5. Virginia Pet. Jobbers Ass'n v. Federal Power Comm'n, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958).

Ordered by the court that said motion for en banc reconsideration be, and it is hereby, denied.

The opinion was handed down February 8, 1962, and a petition for rehearing was lodged with the Clerk March 9— about two weeks after the time for filing had expired. Although the tardily tendered petition is not being received for filing, the court has examined it and found it without merit. It follows that, had the petition for rehearing been seasonably tendered and formally filed, it would have been denied.

Motion denied.

EDGERTON, BAZELON, FAHY and WASHINGTON, Circuit Judges, dissent.

WILBUR K. MILLER, Chief Judge (in support of the foregoing order).

This case originally came before us on appeal from an interlocutory order of the District Court denying Armour's motion that the Secretary of Agriculture be preliminarily enjoined from enforcing his regulation that the label IMITATION HAM must be attached to hams which contain a certain percentage of added moisture due to the curing process. In a unanimous opinion handed down February 8, 1962, we held a preliminary injunction should have been issued.

■ Our Rule 26, 28 U.S.C.A., provides that a petition for rehearing may be filed within fifteen days after judgment or decision, "unless the time is shortened or enlarged by the court or a judge thereof." It applies to all litigants, and does not provide that extensions of time shall be automatically granted when requested. On the thirteenth day of his fifteen-day period, the Secretary of Agriculture moved for an extension of time within which he might file a petition for rehearing. It is a weighty matter, he said in effect, to decide whether his IMITATION HAM regulation should be suspended *pendente lite*, and he needed more than fifteen days allowed by the Rule to prepare and present his argument for rehearing.

As Chief Judge, I considered the motion and opposition and denied the extension, because I was convinced there was no excuse for the Secretary's inaction, that further delay would be unfair to Armour, and that the preliminary injunction we ordered February 8 should be made effective.

■ The matter is now before us on the Secretary's motion for *en banc* reconsideration of the application for extension of time within which to file a petition for rehearing, and we have denied it in the foregoing order. As four members of the court favor overruling my denial of enlargement of time, and have filed a dissent from the above order, I think it proper to state why I denied the extension in the first place.

The notion that grave departmental deliberation had to precede a decision to seek rehearing in this case is, of course, absurd. The decision could have been— and in all probability was—made within thirty minutes after reading our opinion. The case is simple, and our opinion is brief and, I think, reasonably clear. A petition for rehearing could easily have been prepared in two or three hours.

Any suggestion that our opinion of February 8 decided the case on the merits is without foundation. We carefully stated we were deciding as we did on the basis of the record as then constituted. We said, *inter alia*:

> "On consideration of the papers before us, we think it was clearly error to deny Armour's motion for a preliminary injunction. The Secretary's amendatory regulation, which is under attack, is capricious and arbitrary on its face in requiring a packer to label a genuine ham as IMITATION HAM, thus forcing him into violating the statute which forbids misbranding; *and nothing in the record as presently constituted* supports or justifies such an enforced distortion of the truth. The Secretary could easily have made this litigation unnecessary by mere-

ly requiring that labels on moist hams bear a legend showing the nature and extent of the added moisture. Instead, he chose to require the false and deceptive IMITATION HAM label.

\* \* \* \* \* \*

" \* \* \* Upon remand, such an injunction should be entered. *Thereupon, the appellees will of course have an opportunity to plead in justification of their position, and to introduce proof on the issues formed by the pleadings.*" (Emphasis added.)

Of course we considered, on the basis of the then present record, whether Armour probably would prevail on the merits. Surely nobody will say that was improper. After considering the papers before us, we decided Armour probably would prevail, and that was one of the reasons for directing a preliminary injunction. The leg of a pig is a natural product, and a ham is still a part of a pig's leg even though treated with a curing solution. The injection of moisture cannot transform it into an imitation of a real ham.

There may be cases indicating that a manufactured product should be labeled "imitation" if it does not conform to accepted standards for that product; or that a synthetic product which approximates the properties of a natural product, but in fact is not that product, should bear the label "imitation." But such cases cannot apply here: a natural ham is not made into a manufactured or synthetic imitation of a real ham because it has been subjected to a curing process which leaves in it a residue of moisture.

I repeat these sentences from our opinion:

" \* \* \* The Secretary could easily have made this litigation unnecessary by merely requiring that labels on moist hams bear a legend showing the nature and extent of the added moisture. Instead, he chose to require the false and deceptive IMITATION HAM label."

In fact, in oral argument, it was suggested from the bench that the case could easily be disposed of if the regulation were changed in that manner so as to reflect the facts; the Secretary has not accepted the suggestion.

In spite of the denial of his motion for more time, the Secretary of Agriculture lodged a petition for rehearing with the Clerk on March 9—some two weeks after it was due. Although it has not been filed, we have examined it and have decided it states no reason for changing the conclusion we reached in our opinion of February 8. Hence, the foregoing order is being entered.

I am authorized to say Judges Prettyman, Danaher, Bastian and Burger concur in the order and in this statement. Judge Prettyman will file a concurring opinion at a later date.

(Judge Prettyman's concurring opinion, filed April 13, 1962, follows.)

PRETTYMAN, Circuit Judge.

I agree with Chief Judge Miller's opinion, but in view of the Government's vehement insistence upon its position I add some further comments.

As my brother Bazelon points out, our function in reviewing the denial of a preliminary injunction by the District Court is to determine whether the trial judge abused his discretion, and one factor in that consideration is the likelihood that the movant will ultimately prevail on the merits.[1] In other words, one controlling question before us in this matter was: Was the plaintiff's chance of success so great that the trial judge abused his discretion in denying the injunction? We considered that question and decided it. Of course our consideration was upon the papers before us. We did not

---

1. Virginia Petroleum Job. Ass'n v. Federal Power Comm., 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (D.C.Cir.1958); Embassy Dairy v. Camalier, 93 U.S.App.D. C. 364, 367, 211 F.2d 41, 43 (D.C.Cir. 1954); Perry v. Perry, 88 U.S.App.D.C. 337, 338, 190 F.2d 601, 602 (D.C.Cir. 1951).

decide the merits of the case, because the case has not been tried on the merits. But we were required to evaluate, on the basis of the papers thus far presented, the plaintiff's chances of success on the merits. This is a feature of any appeal from denial of injunctive relief at the preliminary stage. Perhaps, shocked by the grossness of the consumer deception embodied in the directive of the Government, we failed to employ the circumlocution customary in such matters.

The regulation [2] which is the foundation of this lawsuit deals with the weight of hams and similar products. It provides that the weight of a smoked product such as a ham shall not exceed the weight of the fresh, uncured article. The Secretary's authority to issue such a directive is claimed under the federal Meat Inspection Act.[3] The complaint alleges that this proposed requirement as to weight is arbitrary and capricious and therefore void. This allegation, as the District Court correctly held, poses genuine issues of material fact and therefore must be tried.

The presently acute controversy, however, arises upon a collateral result of the foregoing basic mandate. If the proposed regulation is promulgated, say the defendant officials, all hams offered for sale weighing more than their original, uncured weight, must bear a label IMITATION HAM. Defendant Clarkson, Administrator of the Agricultural Research Service, states in an affidavit in the record, "The amended regulations will protect the consumer by providing that products not meeting the moisture requirements of the regulations shall be identified as 'IMITATION'." Defendant officials repeat that assertion in their brief here. On the fore-page of its brief, where our rules require that the questions presented by the appeal be stated, appellant states one question only. It is:

"Did the District Court abuse its discretion in denying appellant a

preliminary injunction against the enforcement of an amendment to certain federal meat inspection regulations promulgated by the appellees requiring that certain of appellant's smoked pork products, no different than its other smoked pork products except that they contain up to 10% more moisture, bear the label 'IMITATION' rather than some other label such as 'CONTAINING NOT MORE THAN 10 PER CENT ADDED MOISTURE' when produced in appellant's federally inspected plants?"

In their statement of the questions presented, the defendant officials do not mention the label. However we found from the record before us that the label issue is a real one of considerable consequence. We therefore had to, and did, deal with it in so far as it was posed on the papers in the record thus far.

The weight problem in respect to hams involves their moisture content. Hams, of course, are cured pork. In the curing process water is added to the meat. The Secretary would require that this extra moisture be dried out of the product before sale. The proposed regulation would require packers to proclaim that a ham containing more water than was in the original, uncured article, is an "imitation ham". Such a label, says the plaintiff, is deceptive, false, unauthorized by the statute, and the requirement is therefore arbitrary, capricious and illegal.

As authority for their labeling requirement the defendant officials point to another, long-established regulation which reads:

"(b) A label for product which is in imitation of another food shall bear the word 'imitation' immediately preceding the name of the food imitated and in the same size and style of lettering as in that name and immediately thereafter the word 'ingredients' and the names of the

**2.** 9 C.F.R. § 17.8(c) (49), (54) (Supp. 1962).

**3.** 34 Stat. 1264 (1907), 21 U.S.C.A. § 89.

ingredients arranged in the order of their predominance." [4]

The quoted regulation treats of a label for a "product which is in imitation of another food". So the validity of the proposed regulation, under authority of the regulation just quoted, depends upon whether a ham weighing more than its initial, uncured weight by reason of added water is in imitation of some product other than ham. Of course it is not. Everybody knows that a ham made of the cured thigh of a hog and otherwise unaltered save by the addition of a bit of water is not an imitation of some product other than ham. It may be more moist than the unwetted pork meat, but it is still ham if it is cured hog thigh. As a matter of plain fact, such a ham is not even an imitation ham. It is a real ham, a ham by definition and by universal common acceptance. When a housewife, presented with a dry ham, soaks it in water or boils it, thus adding moisture, she knows, and everyone knows, that she has not thereby transmuted the real ham into an imitation ham. This understanding is common knowledge. If you add water to a ham, what other product do you imitate? Obviously no other product. Since the regulation relied upon by the Secretary validates an IMITATION label only for a product which is an imitation of another product, the foregoing plain facts should end the matter.

But there is another conclusive provision in the statute itself. It prohibits sale of any meat product "under any false or deceptive name".[5] And the regulation under that section provides that "No product, and no container thereof, shall be labeled with any false or deceptive name".[6] To measure whether a label employing ordinary words of common usage is false or not, the words must be taken in their ordinary meaning.

Judge Hastie stated the rule in this fashion:

"The correct standard was the reaction of the ordinary consumer under such circumstances as attended retail distribution of this product. When a statute leaves such a matter as this without specification, the normal inference is that the legislature contemplated the reaction of the ordinary person who is neither savant nor dolt, who lacks special competency with reference to the matter at hand but has and exercises a normal measure of the layman's common sense and judgment." [7]

"Ham" and "imitation" are ordinary words with well-established meanings. They are contradictory words. An imitation cannot be a genuine; the two terms are antithetical. Water and other similar inert additives do not transform a genuine article into an imitation in common understanding—or in scientific understanding either, for that matter. Real drugs bottled with water are not "imitations" of the drugs. Boric acid sold in solution as an eyewash is not imitation boric acid. Whiskey-and-water is not imitation whiskey. As Chief Judge Miller points out, real peaches canned in syrup are not IMITATION PEACHES. The addition of 10 per cent water content (which is what is at issue here) does not change a ham into an imitation. I think the label here required by the Government is a false label.

The other critical word in the statute governing labels is "deceptive". This means, according to the unanimous authorities, deceptive of the consumers to whom the product is offered for sale. These consumers, in major measure in respect to hams, are the housewives of the country. No article of food is more familiar to them. This is a staple of the American table—ham and eggs for

---

4. 9 C.F.R. § 17.8(b) (1959).

5. 34 Stat. 1262 (1907), 21 U.S.C.A. § 75.

6. 9 C.F.R. § 17.8(a) (1959).

7. United States v. 88 Cases, More or Less, Etc., 187 F.2d 967, 971 (3d Cir.), cert. denied, 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648 (1951).

breakfast, ham sandwiches for lunch, baked ham for dinner. The housewife knows a ham. The word "imitation" is likewise perfectly well known to her. It means a fake, a counterfeit, "something made to look like something it is not," as the Oxford Dictionary puts it.[8] So the question is: If a genuine ham plus water is labeled IMITATION HAM, is the housewife deceived? Is she made to think that the package contains something other than genuine ham, say a manufactured luncheon meat? I think it is perfectly obvious that a housewife who believes Government labels would think a package labeled "imitation ham" does not contain a genuine ham more moist than it was in the raw. It seems to me this label is deceptive to the consumers for whose benefit the statute concerning labels is addressed.[9]

And this brings me close to the serious phase of this affair. There are, I suppose, packaged foods which are truly "imitation hams", containing foodstuffs other than the cured hind leg of a pig. Suppose two packages sit side by side on a grocer's shelf. One contains a real ham, with a bit of water added. The other contains a composite substance, not cured pork, made up to resemble ham. Both are labeled IMITATION HAM. Is the shopping housewife deceived? To my way of thinking, an unconscionable fraud is being perpetrated on her by order of the Government. I suggest that when she realizes that genuine and ersatz are alike required to be labeled "imitation" her faith in the processes of the Government to protect her in her purchases of food for her family will surely dissolve into disbelief of the rawest sort. A serious infraction of the faith upon which

our citizens live and upon which the Government exists would be in the making. It would start, not in some cloistered, contemplative atmosphere, but on the shelves of the markets where people in the mass come into direct contact with the Government and its operation. Faith in government at this point, faith in the veracity, the objectiveness, the accuracy of government agencies at this level, in affairs such as these, are the priceless, irreplaceable ingredients of democratic government. We should brook no loose handling in these mundane but delicate matters. If executive officials fail here, or grow autocratic, the judicial branch of government must bring them within the confines of their duty.[10]

I return to the statement of Chief Judge Miller. This controversy could be avoided if the Secretary would require simply that ham with water be labeled ham with water, thus indicating its true nature and content.[11] The vice and difficulty arise when he insists upon taking an ordinary and perfectly well-known word in common usage—"imitation"—, giving it by Government fiat an artificial meaning wholly at variance with its common meaning, and then requiring labels using this synthetic nomenclature. To me this is bureaucratic absolutism run wild—"bureaucracy run rampant", to borrow a phrase. The proposed requirement of IMITATION HAM on these hams is dangerous in its obvious consequences.

I now examine the official reasoning supporting the label requirement. The defendant officials say that "As far back as October 1, 1925, the word 'IMITATION' had been required by the regulations to be applied to meat food products simulat-

---

8. See 62 Cases, etc., of Jam v. United States, 340 U.S. 593, 599, 71 S.Ct. 515, 95 L.Ed. 566 (1951), where Mr. Justice Frankfurter, speaking of the word "imitation" in 21 U.S.C.A. § 343(c), said: "In that section Congress did not give an esoteric meaning to 'imitation.' It left it to the understanding of ordinary English speech."

9. See United States v. 95 Barrels of Vinegar, 265 U.S. 438, 443–444, 44 S.Ct. 529,

68 L.Ed. 1094 (1924); United States v. Lexington Mill Co., 232 U.S. 399, 409, 34 S.Ct. 337, 58 L.Ed. 658 (1914).

10. See Brougham v. Blanton Mfg. Co., 249 U.S 495, 500, 39 S.Ct. 363, 63 L.Ed. 725 (1919); Houston v. St. Louis Packing Co., 249 U.S. 479, 483–484, 39 S.Ct. 332, 63 L.Ed. 717 (1919).

11. Cf. Nolan v. Morgan, 69 F.2d 471, 474 (7th Cir. 1934).

ing sausage in casings." We agree. Of course simulated sausage can validly be required to be labeled "imitation". Simulation is imitation. And sausage is a composite of ingredients requiring a recipe for its manufacture, simulated easily by the use of other ingredients. Ham is not such a product. By no legerdemain of semantics can this analogy be applied to pure ham varied only by the addition of a bit more water. The analogy is farfetched and supplies no support for the presently proposed labeling of hams.

The defendant officials say the purpose of the label IMITATION on these hams is to protect consumers, "the public's interest in knowing what it buys and getting what it pays for". Just how a label IMITATION on a genuine ham, overweight because of water content, tends to show the public what it buys escapes me. The public, by that label, is told it is not buying genuine ham. That information is not true, and is not in the public interest as I see it.

A copy of the required label is an exhibit in the record before us. A look at it fails to disclose consumer protection of any sort. Besides the IMITATION HAM in large letters, and some cooking instructions, the label has this: "Ingredients: Pork Ham, Water, Salt, Sodium Tripolyphosphate, Sugar and Sodium Nitrate." The label does not show the amount or percentage of water content! The ingredients listed would be the same whether the ham was green weight or weighted with additional water! Even if a consumer were alerted by the scarehead IMITATION HAM, he would learn nothing from the rest of the label. He could not tell what amount of water was in the ham or whether it was dry or moist. He would be left to believe that the product in the package was an imitation, not a real ham.

The chemicals named among the listed ingredients are those used in the curing process. They are the same whether the added water is left in the ham or is dried out as the Government would require. The authorities make no point about these chemicals; they do not suggest that consumers need be protected against these ingredients. The label requirements involved in this case have nothing whatsoever to do with deleteriousness, harmfulness or adulteration. Ham is a healthful product with or without water, indeed one of the healthiest products on the American market. The proposed regulation is aimed at controlling the weight of the ham and its moisture, and nothing else.

The protection which the Government says the label affords consumers is against economic deception. Water, says the Government, is a cheap and simple means of economic adulteration. The papers now before us contain uncontradicted affidavits, filed by plaintiff, asserting that as the water content of hams has increased the price has decreased; so that, as a fact, the price of the protein has remained relatively constant. The Government has made no factual allegation as to price. It did not in its pleadings or affidavits supply any factual support for this argument as to economic adulteration. It has not alleged as a fact that the added water content increased the price of the protein content.

In support of this contention the Government makes a statement that ham with water added is an inferior ham. Appellant says to the contrary. This, of course, poses an issue of fact which must be tried on the merits. We note it here only because the Government asserts it as justification for the label. We consider it only for that purpose, and only on the papers now before us. All the evidence in those papers, including Government statements in December, 1960, is to the contrary of the Government's present contention. A statement by a deputy administrator of the Agricultural Research Service, repeated at hearings on the now-proposed regulation, was that Department scientists found that the drying-out back to uncured weight caused some *loss* of proteins, fats and other nutrients. Appellant alleges that hams produced under the former regulation (i. e., with up to 10 per cent water

added) have higher nutritional quality than those brought back to green weight. It alleges that a witness for the Government at the hearings on the proposed regulation testified that a ham with 10 per cent added curing solution is in fact a more nutritional product than a ham processed so as not to exceed its fresh, uncured weight. The Government's assertion of inferiority in moist hams is, on the papers before us, unsupported by factual allegations and contradicted by many such allegations.

Defendant officials say that a label showing the water content of a ham would not suffice, because "consumers do not read everything on a label" and even those who read such a label of water content might not understand it. This reasoning is a blow at the whole theory of labeling. It is wholly untenable. Then follows this, to me amazing, justification for the proposed label requirement:

"The presence of the word 'imitation,' however, serves as a signal designed to alert even the most complacent or undiscerning consumer that the product he is buying is not all that it might appear to be. The word invites inquiry as to the nature of the product they are buying and this they may determine by the statement of contents appearing on the label."

Of course this sort of *in terrorem* labeling is used where danger lurks in an article—Beware, Poison, etc. But for the Government to require a label IMITATION on a genuine article, in order to invite inquiry as to the weight of the water content, seems to me to be wholly without reasonable warrant.

The defendant officials say the effect of the prior regulation (effective from December, 1960) was to permit the marketing of wet hams without special labeling, and that this caused heavy protest and vigorous opposition. They do not say the protests urged the label IMITATION, and such a label is surely not the only special label available to indicate added water.

To my mind, the reasoning in the defendants' brief here is a curious bit of syllogistic effervescence. They say they had deemed it best for consumer protection to set up standards for hamburgers and sausage. Of course so; if any meat products on the market require an authoritative prescription of ingredients, these are such products. They say a deviation from those standards requires special labeling. Quite correct, I think. But I cannot follow the jump in reasoning from labels showing the ingredients of sausage and hamburger to a label "imitation" on a ham containing only water. The mental process seems to be that since the Secretary can prescribe ingredients he can require any deviation from his prescription to be labeled "imitation". That the word "imitation" has a factual meaning in ordinary usage has no place in this reasoning. The assumption seems to be that since he can prescribe labels for deviations from standards he can use any words he chooses for those labels. To my mind this is not only logistically fallacious but is a flat violation of the whole statute on labeling and branding.

We are told that this policy of labeling "imitation" any variation from unmodified purity runs all through the administration of the pure food and drug laws. If this were so, I for one would advocate that the whole enforcement machinery of these statutes be overhauled and made to conform to terms understandable to consumers. But I do not find this to be so. Of course labels bearing the word are commonplace, as the defendants say. There are many, vast numbers I would suppose, of imitation, counterfeit, fake, synthetic, ersatz, spurious foods and drugs. The statute repeatedly uses the word in its true sense. It talks about "imitation butter" [12] and "in imitation or semblance of milk".[13] The statute contains a long, detailed provision as to when a drug shall be deemed to be mis-

---

12. 21 U.S.C.A. § 25.

13. Id. § 61.

branded.[14] It contains no hint or suggestion that water content must be noted on a label or that a drug plus water must, or could, be labeled "imitation". The word "imitation" is used once in this section, where it provides that a drug is deemed misbranded "if it is an imitation of another drug". This use of the word seems to indicate that the act uses it in its established meaning.[15] The act[16] describes a list of additives which must be mentioned on the label, including alcohol and drugs such as bromides, ether, arsenic, digitalis, etc. It does not mention water as an additive which must be mentioned to avoid misbranding. So far as I can find, the Food and Drug Act contains no support for the proposition that a pure ham plus water could or would be required by it to be labeled IMITATION HAM.

My own opinion is that the Secretary's regulation is illegal on its face as a matter of law. His authority under the statute is to prescribe labels which are not deceptive to consumers. He has no power to require a label which is deceptive in its use of words of common usage and meaning.

I would not have written at such length had not the defendant officials so vigorously insisted upon what seems to me to be a wholly untenable position, and had not that position involved a gross deception (or so it seems to me) of plain, ordinary people in the mass. If the Government can do this in this case, in what case can it not require labels using words in an assumed sense opposite to their ordinary meaning?

On the second factor which, as my brother BAZELON points out, must be considered by us, we concluded that plaintiff is suffering irreparable harm. We were of opinion that every day on which plaintiff is compelled by Government edict to sell genuine products as imitations, it is suffering injury to its reputation and enormous, irrecoverable losses in profits.

In summary my view is:

(1) No authoritative support is offered, or exists, for the proposed label regulation, so far as the papers presently on file are concerned;

(2) the proposed label is false;

(3) the proposed label is deceptive to consumers;

(4) the proposed label is illegal;

(5) no excuse exists for insistence upon this label, as all recognizable purposes could easily be achieved by a simple, accurate labeling, indicating the proportion of water content in these hams;

(6) the proposed label is contrary to the public interest in the most serious sense; and

(7) the trial judge, in the applicable legal idiom, abused his discretion in denying the preliminary injunction.

I have tried to treat seriously and soberly the Government's contentions in respect to this label, although much of its argument seems to me to border on the fantastic.

BAZELON, Circuit Judge, with whom EDGERTON, FAHY and WASHINGTON, Circuit Judges, concur (dissenting).

The Court's action today is the latest phase in a controversy over the Secretary of Agriculture's regulations governing the content and labeling of smoked products moving in interstate commerce. In the period 1952–60, the Secretary's regulations had required that the weight of smoked cured products, including hams, not exceed the weight of the fresh uncured article.[1] Non-conforming products were required to be labeled IMITATION—as are all products not conforming to the Secretary's regulations.[2] The purpose of the regulations was to prevent

---

14. Id. § 352.

15. See 62 Cases, etc., of Jam v. United States, supra note 8.

16. 21 U.S.C.A. § 352(e).

1. 17 Fed.Reg. 4845 (1952); 18 Fed.Reg. 7536 (1953).

2. 6 Fed.Reg. 1142 (1941), 9 C.F.R. § 17.8 ʲ(b).

the marketing as a genuine ham of a product whose weight had been substantially increased by injecting water and other fluids. It was thought that consumers should not have to pay for water at ham prices.

The regulations were amended in December 1960 to permit cured hams to weigh ten percent more than the fresh, uncured product.[3] Following opposition by some consumer groups, a series of hearings was held after which the Secretary reinstated the prior regulations. As a consequence, hams which weighed more after curing than before were once again required to be labeled "IMITATION."

Just before the Secretary's order reinstating the earlier regulations became effective, Armour brought suit attacking their validity and seeking a permanent injunction against their enforcement. Armour also moved for a preliminary injunction pendente lite. The District Court denied the motion, and Armour appealed. We rejected Armour's application to stay the effective date of the regulations pending appeal. Thereafter the appeal was heard and this Court reversed the District Court in an opinion which, in terms, held that the Secretary's imitation labeling requirement was "arbitrary and capricious on its face." The validity of that requirement had not been challenged in the complaint below: what had been challenged was the Secretary's directive that smoked meats moving in interstate commerce be processed to "green" (i. e., uncured) weight.

*Before* expiration of the period for seeking rehearing, the Secretary requested an extension of time in which to file a petition for rehearing in banc. That request was denied by the Chief Judge *after* the period for filing a timely petition had expired. The case is now before us on the Secretary's petition for a rehearing in banc of that denial. I vote to allow the Secretary to file the petition for rehearing of this Court's decision granting preliminary relief.

In support of its motion for an extension of time, the Government alleges in substance that the Court's characterization of the regulation as "arbitrary and capricious on its face" and as "forcing packers to violate the statute" is virtually a conclusive adjudication of the merits of the controversy.[4] Because that adjudication has far-reaching implications for the administration and enforcement of the Meat Inspection Act and the Federal Food, Drug, and Cosmetic Act, the Government faced the question whether to seek a rehearing in banc. We understand from the Government's motion that departmental procedures required consultations among attorneys for the Department of Justice, administrative personnel and attorneys for the Department of Agriculture, and approval by the Solicitor General. Moreover, additional time was required for the preparation of the petition in order to present the merits of the controversy, which were reached in the Court's opinion but were not the primary focus of the parties on the appeal from the District Court's denial of preliminary relief.

Our records show that a litigant's first request for a reasonable extension of time to file a petition for rehearing is ordinarily granted as a matter of course. Moreover, there are compelling reasons for granting an extension here.

The injury to Armour is hardly sufficient to warrant our extraordinary haste. The opinion says injury "is apparent without demonstration" because Armour's good name will be besmirched if it is compelled to market its watered hams under the label IMITATION. The District Court did not agree. Nor do I.

---

3. 25 Fed.Reg. 13952 (1960).

4. In Young v. Motion Picture Ass'n, 112 U. S.App.D.C. ——, 299 F.2d 119 (1962), this Court recognized:

"* * * the general rule that a denial of a preliminary injunction will not be set aside on appeal unless the District Court's action constitutes clear error or abuse of discretion, and *that ordinarily this court will not consider the merits of the case further than necessary to determine whether that discretion was abused.*" [Emphasis supplied.]

Hundreds of packers—including Armour—market products labeled IMITATION, and have done so for many years. And Armour is not compelled to market watered hams if it fears the impact of the "IMITATION" label. Armour submitted affidavits showing that "there would be no need to use different equipment or to in any sense retool so as to be able to shift production of hams with a finished weight in excess of the fresh, uncured weight to hams weighing no more than the fresh, uncured weight * * *." Nor is there reason to think that either alternative, use of the IMITATION label or elimination of the excess water, would seriously affect Armour's profits. In prior years, Armour has profitably sold both watered hams labeled IMITATION and dried hams complying with the Secretary's regulations. Moreover, the Government points out that Armour's earnings for the quarter ending January 1962, when the regulations were in effect, were *greater* than in the year-earlier period when the regulations permitted the marketing of watered hams without the "IMITATION" label.[5] In view of these facts, I see no reason to fear significant harm to Armour in the face of an additional fifteen-day delay. And it must be remembered that there is no singling out of Armour. All packers covered by the Act must meet the same standards and compete on the same basis.

I think, moreover, there are strong arguments in support of the Secretary's authority to issue the challenged regulations. Under the Meat Inspection Act of 1907,[6] the Secretary is empowered to establish standard definitions of meat products.[7] That statute prohibits the offering for sale in interstate commerce of meat or meat food products "under any false or deceptive names; but established trade names or names which are usual to such products * * * which shall be approved by the Secretary of Agriculture are permitted."[8] In or-der to implement the statute, the Secretary of Agriculture has long specified the ingredients which may be included in certain products. His power to do so was upheld in Houston v. St. Louis Packing Co., 249 U.S. 479, 39 S.Ct. 332, 63 L. Ed. 717 (1919), where a meat packer protested the Secretary's determination that water or ice must not exceed three percent and cereal two percent of the weight of a product labeled "sausage." The issue there was whether the Secretary could refuse to stamp a product "inspected and passed" which did not comply with the regulation. The Court held that he could, pursuant to the section of the statute to which we have just referred. Indeed, the Court said:

"Whether or not the term 'sausage,' when applied to the product of the appellee, in which more than the permitted amount of cereal and water is used, is false and deceptive is a question of fact, the determination of which is committed to the decision of the Secretary of Agriculture by the authority given him to make rules and regulations for giving effect to the act, and the law is that the conclusion of the head of an executive department on such a question will not be reviewed by the courts where it is fairly arrived at with substantial evidence to support it." [249 U.S. at 484, 39 S.Ct. at 334.]

It would appear that the regulation specifying the water which may be added to a product labeled "ham" may be valid under the authority of the Houston case. See also Brougham v. Blanton Mfg. Co., 249 U.S. 495, 39 S.Ct. 363, 63 L.Ed. 725 (1919).

There is also authority for the Secretary's use of the word "imitation" to describe a product which does not conform to the standards he has established—although this Court's opinion seems to say that such usage is itself misbranding.

5. The Wall Street Journal, Feb. 19, 1962, p. 17.

6. 34 Stat. 1260 (1907), as amended, 21 U.S.C.A. § 71 (1953).

7. Houston v. St. Louis Packing Co., 249 U. S. 479, 39 S.Ct. 332, 63 L.Ed. 717 (1919).

8. 34 Stat. 1262 (1907), 21 U.S.C.A. § 75.

In 62 Cases, etc., of Jam v. United States, 340 U.S. 593, 71 S.Ct. 515, 95 L.Ed. 566 (1951), the Supreme Court held that jam which contained insufficient fruit ingredients to comply with the Secretary's standards was *not* misbranded if it were labeled "DELICIOUS BRAND IMITATION JAM." Speaking of the use of the word "imitation," the Court wrote:

> " * * * nothing can be legally 'jam' after the Administrator promulgated his regulation in 1940, 5 Fed.Reg. 3554, 21 C.F.R. § 29.0, unless it contains the specified ingredients in prescribed proportion. Hence the product in controversy is not 'jam.' It cannot lawfully be labeled 'jam' and introduced into interstate commerce, for to do so would 'represent' as a standardized food a product which does not meet prescribed specifications.

> * * * * * *

> " * * * the name 'imitation jam' at once connotes precisely what the product is: a different, an inferior preserve, not meeting the defined specifications. * * * A product so labeled [as imitation] is described with precise accuracy. It neither conveys any ambiguity nor emanates any untrue innuendo, as was the case with 'Bred Spred' considered by Congress in its deliberation on § 403(g). See H.R.Rep.No. 2139, 75th Cong., 3d Sess. 5; House Hearings on H.R. 6906, 8805, 8941 and S. 5, 74th Cong., 1st Sess. 46–47. It purports and is represented to be only what it is—an imitation. It does not purport nor represent to be what it is not—the Administrator's genuine 'jam.'" [340 U.S. at 599–600, 71 S.Ct. at 519–520.]

In the period 1952–60, moreover, the Secretary required watered hams to be labeled IMITATION without provoking protest from the industry that his action was arbitrary and capricious. The IM-ITATION label requirement which this Court has struck down has been in force since 1941. Finally, when this suit was instituted, approximately 1,300 labels bearing the legend "IMITATION" were on file with the Department of Agriculture and were being used by several hundred packers (including Armour) to identify a host of products (e. g., bologna, chicken, frankfurters, chicken loaf, sausage, salami, and, of course, ham) solely because they did not conform to the Secretary's standards.

The Secretary contends that in deciding the issue of preliminary relief, this Court's opinion effectively disposed of the final issues in the case. He finds this in the Court's statement that:

> "The Secretary's amendatory regulation which is under attack, is capricious and arbitrary on its face in requiring a packer to label a genuine ham as IMITATION HAM, thus forcing him into violating the statute which forbids misbranding; and nothing in the record as presently constituted supports or justifies such an enforced distortion of the truth. * * * he chose to require the false and deceptive IMITATION HAM label." [page 405.]

This calls to mind the dissenting opinion of Judge Amidon of the Court of Appeals for the Eighth Circuit in St. Louis Independent Packing Co. v. Houston, 242 F. 337, 346 (1917):

> "This case has followed an unusual course, and has led to unfortunate results. When it was here on appeal from the order denying the preliminary injunction, this court, without any judicial investigation of the facts, decided that the name 'sausage' could be deprived of its false and deceptive character, when applied to plaintiff's product, by the use of qualifying words, and ordered the temporary injunction to issue.[9] The case then went back to

---

9. In our case, the Court wrote: "The Secretary could easily have made this litigation unnecessary by merely requiring that labels on moist hams bear a legend showing the nature and extent of the added moisture." [Slip opinion, pp. 3–4.]

be tried in the lower court upon the merits, but this court had already precluded such an investigation. Our decision was held to be binding upon the trial court that the name was not false and deceptive, and that court was shut up to an investigation of whether plaintiff's product was unwholesome. The result is that the question whether the name is false and deceptive, as used in the channels of trade, is finally decided by this court against the decision of the Department solely on bill and answer, and without any investigation of the question. Fortunately, if this case shall be taken to a higher court for review, our decision on the appeal from the order denying a temporary injunction will be open for re-examination."

The dissent was vindicated by the Supreme Court. Houston v. St. Louis Packing Co., 249 U.S. 479, 39 S.Ct. 332 (1919), reversing 242 F. 337 (8th Cir. 1917).

Not only does the Government argue that the Court's opinion in this case is too broad, but further that it is otherwise wrong. The question on appeal from the denial of a temporary injunction is whether the District Court abused its discretion. See Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944). In reviewing the exercise of that discretion, we have said that four factors are to be considered: (1) whether the movant would suffer irreparable injury if a preliminary injunction were denied; (2) the likelihood that the movant will prevail on the merits; (3) the effect of granting or denying the motion on the public interest; (4) the effect of grant or denial upon other interested persons. Virginia Pet. Jobbers' Ass'n v. Federal Power Comm., 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). There is strong reason to believe that the District Court correctly resolved these factors in denying preliminary relief. Accordingly, I would allow the Government to file its petition for rehearing in banc. And only after Armour has had an opportunity to reply would I decide whether a rehearing in banc is warranted.