Edward J. WAWSZKIEWICZ et al., Plaintiffs,

v.

DEPARTMENT OF THE TREASURY et al., Defendants.

Civ. A. No. 79–0842.

United States District Court, District of Columbia.

Nov. 20, 1979.

Harold E. Mesirow, Washington, D. C., R. Frederic Fisher, San Francisco, Cal., for plaintiffs.

A. Patricia Frohman, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

GESELL, District Judge.

Plaintiffs, three sophisticated wine consumers,[1] challenge a rule promulgated by the Department of the Treasury regulating the labeling and advertising of wine. 27 C.F.R. § 4.1 et seq. (1979). They claim that the regulation, by failing to require accurate and sufficient representations as to the identity of the wine producer and the varieties and geographic origins of the grapes used, violates requirements of truthfulness and disclosure set forth in the enabling statute. 27 U.S.C. § 205(e) (1976). Cross-motions for summary judgment have been fully briefed and argued by both sides. This Court has subject matter jurisdiction under 27 U.S.C. § 205(e); plaintiffs have standing as parties "adversely affected or aggrieved by agency action."[2] 5 U.S.C. § 702 (1976). See Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). After examining the motion papers and reviewing the agency's voluminous administrative record of the rulemaking hearings, no genuine issues of material fact are apparent. The Court must determine whether or not certain provisions of the challenged regulation are invalid either because they are inconsistent with the statutory mandate, or arbitrary, capricious and an abuse of discretion. 5 U.S.C. § 706(2)(A), (C) (1976).

The Federal Alcohol Administration Act, Pub.L. No. 74-401, 49 Stat. 977 (1935) ("FAA Act"), enacted shortly after repeal of Prohibition, imposed a comprehensive regulatory scheme on the business of liquor distribution and production. As part of the Act, Congress required all wines in interstate commerce to carry labels that are

in conformity with such regulations, to be prescribed by the Secretary of the Treasury, . . . (1) as will prohibit deception of the consumer with respect to such products or the quantity thereof and as will prohibit, irrespective of falsity, such statements relating to age, manufacturing processes, analyses, guarantees, and scientific or irrelevant matters as the Secretary of the Treasury finds to be likely to mislead the consumer; (2) as will provide the consumer with adequate information as to the identity and quality of the products . . . and the manufacturer or bottler or importer . . . [and] (4) as will prohibit statements on the label that are . . . false [or] misleading . . . .

27 U.S.C. § 205(e).

The Secretary of the Treasury issued regulations pursuant to § 205(e) in December, 1935; these regulations remained in effect for over forty years. The new regulations, which are substantially similar to[3] the orig-

---

1. Plaintiff Wawszkiewicz, a university professor of microbiology, teaches enology (the science of wine), is part-owner of a small vineyard in California, and has been active as a wine-making consultant for over 20 years. Plaintiff Benson, a professor of administrative law, has authored a book on wine and currently writes a column on wine for the American Bar Association Journal. Plaintiff Harris has been sufficiently active in wine tasting over a period of years "to have developed a reasonably educated palate." Affidavit of H. Donald Harris, ¶ 3. All three plaintiffs have an extensive knowledge of domestic and imported wines, and each purchases annually several hundred dollars of wine labeled under the regulations challenged in this action.

2. Standing is predicated on plaintiffs' status as consumers; while their purchase of wines for ordinary consumption brings them squarely within the zone of interest of § 205(e), their special position as wine connoisseurs is not an object of particular statutory concern.

3. In many respects the regulations are unchanged from the original 1935 version. Two of the three features raised in this action, the varietal (i. e. grape type) rule and the geographic rule, underwent some changes in 1978. The third feature, identity of the producer or maker, was left unaltered following agency discussion of possible revisions. On the latter issue, plaintiffs challenge the failure to revise.

inal ones, were promulgated by the Bureau of Alcohol, Tobacco and Firearms ("BATF")[4] pursuant to the informal rulemaking requirements of the Administrative Procedure Act. 5 U.S.C. § 553 (1976). They were approved in final form on August 16, 1978, (see 43 Fed.Reg. 37,678, Aug. 23, 1978), following four notices of proposed rulemaking[5] and three sets of public hearings held in Washington, D. C., and San Francisco.[6]

Plaintiffs focus their challenge on three specific aspects of the final regulation. They complain first of the "varietal rule," which allows wine labels to carry the name of a single grape type or variety (e. g. "Chardonnay" or "Pinot Noir") without disclosing that other possibly inferior grape varieties may compose up to 25 percent of the volume (49 percent until January 1, 1983). See 27 C.F.R. §§ 4.23, 4.23a. Next they cite the "geographic rules," which permit wines to be represented as made from grapes grown entirely within one geographic region (e. g. "Sonoma County," "Napa Valley") with no disclosure that as much as 25 percent[7] of the volume may derive from grapes grown in other, perhaps less celebrated regions. See 27 C.F.R. §§ 4.25(a), 4.25a. Finally, plaintiffs attack the provisions allowing a winery to represent that it "produced" a certain wine while fermenting and clarifying as little as 75 percent of the volume, and to claim that it "made" a wine when in fact it may have received the wine from elsewhere for cursory treatment in its cellars. See 27 C.F.R. § 4.35(a)(1), (2).

Each of these issues was sharply raised during the rulemaking proceeding in which many consumers, including plaintiffs, were active participants.[8] Plaintiffs do not contend here that the agency should require 100 percent purity for wines designated by a particular geographic region or variety of grape.[9] They argue instead that the statutory mandate for truthfulness and adequacy of disclosure is not satisfied by regulations which permit labels to bear such incomplete and misleading representations; in their view the mandate can only be met by defining the terms "producer" and "maker" on a wine label and by expressly identifying precise percentages for all grape varieties and geographic regions contributing to the wine labeled. In addition, they claim that since the agency's final statement in the rulemaking record fails to provide a basis for allowing deceptive and uninformative usage of certain key words, the regulation is arbitrary, capricious, and an abuse of discretion.

Although BATF at one point noticed significant proposed changes (see 42 Fed.Reg. 30,517–22, June 15, 1977), the final regulation calls for only minor alterations in existing labeling requirements. The Bureau defends its ultimate position as a reasonable interpretation of its statutory authority, and claims that it should receive great deference because its interpretation of the legislative language dates from within four

---

4. BATF has been delegated to perform the duties and functions of the Secretary of the Treasury under the FAA Act. See 37 Fed.Reg. 11,696 (June 10, 1972).

5. See Notice No. 280, 40 Fed.Reg. 30,117 (July 17, 1975); Notice No. 290, 41 Fed.Reg. 8188 (Feb. 25, 1976); Notice No. 304, 41 Fed.Reg. 50,004 (Nov. 12, 1976); Notice No. 304 amended, 42 Fed.Reg. 30,517 (June 15, 1977).

6. Hearings were held in Washington, D. C., in April, 1976, February, 1977, and September, 1977, and in San Francisco in April, 1976, and in February and November of 1977.

7. Effective January, 1983, wines with an appellation of origin indicating a viticultural area (i. e. grape-growing region), such as Napa Valley, must meet a slightly higher standard of purity

than wines with appellations designating a political subdivision (e. g. a state or county).

8. Plaintiffs Wawszkiewicz testified at length on several occasions both in Washington, D. C., and San Francisco; plaintiff Benson contributed extensive oral testimony as well as written comments.

9. Plaintiffs do point to a mandatory 100 percent rule for certain varietal wines in France (Affidavit of Edward J. Wawszkiewicz, ¶ 10), while defendants argue that a lower percentage allows the winemaker the flexibility necessary to perfect his product (Affidavit of Stephen E. Higgins, ¶ 14). As the agency's percentage requirements are not challenged, the Court expresses no view on the matter.

months of the Act's ratification 44 years ago. Further, the Bureau argues that it considered all relevant factors, balanced the different information needs of ordinary and sophisticated consumers, and set forth in its preamble a rational basis for its decision.

## I

■■■■ In examining an agency's interpretation of statutory provisions, the Court confronts questions of law which it is required to decide. *See Train v. Natural Resources Defense Council,* 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). Although a reviewing court should accord considerable weight to the interpretation rendered by the agency charged with a statute's administration, *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), courts are the final authorities on matters of statutory construction. *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Comm.,* 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090; *modified on other grounds,* 392 U.S. 901, 88 S.Ct. 2049, 20 L.Ed.2d 1361 (1968). As part of its independent judicial review, this Court must therefore determine de novo whether the agency has acted consistent with statutory authority. It should not lightly substitute its own legal judgment for that of the agency, particularly where, as here, the agency interpretation is long-standing; but it must do so if it finds that the agency construction conflicts with the plain meaning of the legislation itself. *Wilderness Society v. Morton,* 156 U.S.App.D.C. 121, 144, 479 F.2d 842, 865 (D.C. Cir.), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973); *Federation of Homemakers v. Butz,* 151 U.S.App.D.C. 291, 293, 466 F.2d 462, 464 (D.C. Cir. 1973). *See also United States v.*

*Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

Section 205(e) of the FAA Act requires that the Secretary's labeling regulations prohibit false, misleading, or deceptive statements. The statutory language is clear and direct. The first question presented is thus whether the label "Chardonnay," for example, applied without any explanatory disclosure to a product that is made from as little as 75 percent Chardonnay variety grapes, is false or misleading; if so, the challenged regulation must be invalidated. *Federation of Homemakers v. Butz, supra,* 466 F.2d at 464.

■■■■ In determining this question, the Court will rely to the extent possible on the ordinary meaning of the words used, as it is the understanding of the ordinary consumer which must control. *Armour & Co. v. Freeman,* 113 U.S.App.D.C. 37, 43, 304 F.2d 404, 410 (D.C. Cir.) (Prettyman, J., concurring), *cert. denied,* 370 U.S. 920, 82 S.Ct. 1559, 8 L.Ed.2d 500 (1962). *See also 62 Cases of Jam v. United States,* 340 U.S. 593, 599, 71 S.Ct. 515, 95 L.Ed. 566 (1951). An agency may of course assign specific meaning to certain words, even if the meaning departs slightly from what would otherwise be common usage. But if words are not assigned their ordinary meaning, false and deceptive communication can be avoided only by requiring labels which give notice of the agency's underlying definitional determinations.[10]

The clear implication of a label bearing only "Chardonnay" is that the wine is made from the Chardonnay variety grape and no other. This is the ordinary meaning even

---

**10.** This Circuit regularly has adverted to the common meaning of labeling representations when reviewing administrative rulemaking under comparable food labeling statutes. *See American Public Health Ass'n v. Butz,* 167 U.S. App.D.C. 93, 97, 511 F.2d 331, 335 (D.C. Cir. 1974); *Federation of Homemakers v. Butz, supra; Armour & Co. v. Freeman, supra.* Statutory prohibitions against "false" and "misleading" labels have formed the basis for an invalidation of regulations found to be lacking in

rigor. Although food labeling statutes grant the Secretary some discretion in his promulgation of rules, the legislative standard prohibiting deception is not easily compromised. *See Federation of Homemakers v. Butz, supra; Armour & Co. v. Freeman, supra. See also United States v. Ninety-five Barrels of Vinegar,* 265 U.S. 438, 444, 44 S.Ct. 529, 68 L.Ed. 1094 (1924) (direct enforcement of statutory labeling provision against individual violator).

though the label does not use "all Chardonnay" or "100% Chardonnay." Not only does the typical front label carry no suggestion of other varieties; the back label frequently discourses at length on the virtues of the identified grape type.

Defendants acknowledge as they must that a wine's nature (color, fragrance, flavor, etc.), is directly influenced by the grape variety or varieties used to make it. The presence in substantial quantity of unlabeled grape varieties or grapes of unidentified geographic origins will significantly affect taste and quality, yet under the challenged regulation consumers need never be alerted to such presence.

At the same time, a wine's cost to producers and price to consumers also vary considerably with its contents. Wines with such varietal labels as Chardonnay command higher prices than a non-varietally labeled wine such as Chablis. Consumers pay higher prices for the varietally labeled wine in expectation of a superior wine, but are not told that their purchase contains a substantial quantity of blending grapes. Nor are they informed that under the challenged regulation a "Chardonnay" label may appear on a 75 percent Chardonnay wine but not on a wine that is composed 74 percent of Chardonnay grapes.

■ In light of agency experience and expertise, BATF has broad discretion in distinguishing among different types of the same product and deciding where precise lines should be drawn. That discretion cannot, however, authorize the agency to use terms in a way likely to deceive or confuse the ordinary consumer.[11] By assigning inaccurate and undisclosed meanings to words which are otherwise clear and unequivocal, the challenged regulation sanctions· the transmittal of false and misleading information. *See Federation of Homemakers v.*

*Butz, supra; Armour & Co. v. Freeman, supra.*

■ Defendants argue that since analogous labeling requirements were promulgated by the Secretary within four months of the legislation itself, the deference due to an agency's statutory interpretation is especially fitting. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Reliance on *Udall* is not appropriate where, as here, the statutory language in question is neither complex nor specialized but instead involves words unambiguous on their face. Even well-settled administrative practice must yield to clear expressions of legislative intent. *Wilderness Society v. Morton,* 156 U.S.App.D.C. 121, 479 F.2d 842 (D.C. Cir.), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).

Nothing in the legislative history of the FAA Act suggests that Congress intended to .deviate from the plain meaning of the statute itself. In testifying on § 205(e)'s labeling provisions, the Director of the Federal Alcohol Control Administration spoke of regulations "intended to insure that the purchaser should get what he thought he was getting, that representations both in labels and in advertising should be honest and straightforward and truthful." *Hearings on H.R. 8539 Before the House Comm. on Ways and Means,* 74th Cong., 1st Sess. 10 (1935) (statement of Joseph Choate, Jr.). The Ways and Means Committee, in reporting favorably on § 205(e), cited the "definite standards [that] are laid down for these regulations." H.R.Rep.No.1542, 74th Cong., 1st Sess. 12 (1935). The floor debate in the House and the bill as enacted reaffirmed that the statutory requirements were meant as rigorous consumer protections.[12] *See e. g.,* 79 Cong.Rec. 11714 (1935) (Rep. Cullen).

---

11. It is no answer, as was suggested by BATF counsel during oral argument, that the consumer can go to the *Federal Register* and read the complicated definitions of winemaking terminology set forth in the regulation.

12. Indeed, although one prominent House supporter criticized the bill for leaving little or no

discretion to the administrator, 79 Cong.Rec. 11723 (1935) (Rep. Celler), the bill retained in final form its strict requirement that the regulations conform to the statutory mandate. The Senate legislative history of the FAA Act does not illuminate the meaning of § 205(e).

Although the agency announced that consumers generally supported a minimum percentage statement on wine labels, 42 Fed. Reg. 30,518 (June 15, 1977), it chose not to require this disclosure in the final rule. In justification, it referred to the possibly misleading effect as well as to the cost and clutter of such labels. While BATF points to some evidence in the record supporting its concerns about cost, cluttered labels, and possible consumer confusion (Affidavit of Stephen E. Higgins, ¶¶ 15–18), it is both speculative and isolated in nature. Indeed, the primary concern of the consumer witnesses specified was less the need for minimum percentage definitions than the problem of how much additional detail should be available,[13] a question addressed below.

Instead of a minimum percentage statement, BATF in its final regulation proposed to rely on a public education program. 43 Fed.Reg. 37,672 (August 23, 1978). The statute, however, does not authorize the Secretary to substitute a public education program for accurate labeling requirements; nor does it make the prohibition of untruthful or deceptive legends contingent on cost considerations. Finally, defendants in their summary judgment papers offer no evidence of any education program nearly fifteen months after the rule has been approved.

There is thus no basis, in law or in fact, for permitting the use of a varietal name on wine labels without disclosing that the identified grape variety does not represent 100 percent of the content. The percentage of the variety must be stated as a minimum of 51 percent, or 75 percent as of January, 1983; if the producer uses a larger percentage than the required minimum, he should be free to so specify. In any event, the percentage of the labeled variety must be truthfully communicated. This same rationale requires that wine labels making representations as to geographic origin or the nature of specific winemaking operations should couple such representations with a more precise indication of what minimum percentages or other meanings attach to the claims made.[14]

Congress has directed that wine labeling terminology be understandable to the ordinary consumer. In the Court's view, this at least requires wine labels to carry concise explanations of any terminology used where principal grape types, chief geographic origins, and the identity of a producer or maker is represented to the consumer. The explanations must at least specify applicable minimum percentage standards, and are to be suitably featured in the context of the label as a whole. Defendants must undertake to modify the regulation accordingly.

## II

■ Plaintiffs press further seeking more detailed disclosures than indicated immediately above. The statute also calls for regulatory provisions which will provide "adequate information as to the identity and qualify of the products." Unlike the absolute prohibition against false or misleading statements, the separate and different obligation to ensure that disclosure is adequate squarely implicates discretionary judgment on the part of the Secretary. An agency's decision to include some information on labels while excluding additional details is certainly subject to review, but the statute itself offers no guidance as to what constitutes "adequacy," nor is such a determination feasible by reference to the

---

**13.** Testimony of consumers and consumer representatives relied on by defendants shows many doubted the need to list percentage beyond the fixed minimum or raised questions about the style and prominence of minimum percentage statements while supporting the basic disclosure of a minimum percentage for each principal grape. *See, e. g.,* Admin.Record: vol. 11, p. 179 (Okada); vol. 11, pp. 272–74 (Horricks); vol. 12, p. 88 (McRory); vol. 12, pp. 108–09 (Garcia); vol. 16, p. 34 (Olken).

**14.** Although the Court's discussion has focused on the varietal feature, the Secretary recognizes that ordering a minimum percentage statement for varietal wines cannot logically be distinguished from mandating that a label refer accurately to geographic origin as well as to the nature of identified winemaking operations. *See* 43 Fed.Reg. 37,672.

ordinary meaning of the words used. The question of whether a label, otherwise not misleading, provides adequate information is not therefore a matter of statutory construction.

■ The Court instead must review the evidence in support of the agency's policy judgments, but may strike the decisions only upon finding them "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is a highly deferential one. The reviewing court must affirm the agency if it assures itself that a rational basis exists for the agency determination, and that the agency considered all relevant factors in arriving at its choice. *Ethyl Corp. v. EPA,* 176 U.S. App.D.C. 373, 541 F.2d 1 (D.C. Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *National Asphalt Pavement Ass'n v. Train,* 176 U.S.App.D.C. 296, 539 F.2d 775 (D.C. Cir. 1976). The Court's role here is of course not simply *pro forma* ; it must be satisfied that the agency has articulated reasons and identified important facts in support of its judgment. *Greater Boston Television Corp. v. FCC,* 143 U.S. App.D.C. 383, 393, 444 F.2d 841, 851 (D.C. Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). But a reviewing judge need not agree that the administrator's choice is optimal or even preferable; so long as the decision is rational and has support in the record, the court may not substitute its own judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ By publishing a series of notices and soliciting comments over a three-year period, the agency provided a meaningful opportunity for all interested parties to be heard. The written statements received and testimony taken fill 24 volumes and include extensive contributions from vineyard owners, wine distributors, public officials responsible for consumer protection,

general consumer advocates, sophisticated wine connoisseurs, and the man in the street. Although the agency's articulation of reasons in its preamble to the final rule is somewhat perfunctory,[15] it qualifies as a concise general statement for purposes of 5 U.S.C. § 553. *See Automotive Parts & Accessories Ass'n v. Boyd,* 132 U.S.App.D.C. 200, 208, 407 F.2d 330, 338 (D.C. Cir. 1968). Plaintiffs' reliance on *Amoco Oil Co. v. EPA,* 163 U.S.App.D.C. 162, 501 F.2d 722 (D.C. Cir. 1974), in this regard is inapposite. That action arose under § 211(c) of the Clean Air Act which specifically requires the administrator to publish precise findings; no such requirement can be found in § 205(e).

■ The record itself contains ample testimony in support of the agency's judgment. Neither the agency nor a reviewing court need possess a special expertise in this context to determine adequacy of information; in deciding how much detail is worthwhile the agency sensibly relied on expressions of consumer preference. A number of witnesses stated that if labels were required to disclose each variety of grape used and every appellation of origin, the resulting clutter might prove more a distraction than a benefit. More important, such minute percentage requirements would certainly increase labeling costs, particularly since blends are constantly being adjusted and labels would have to be individualized accordingly.[16] The Secretary was entitled to rely on such testimony and to conclude that consumers would be opposed to paying higher prices for information of marginal value to all but the most sophisticated. This exercise of administrative discretion receives further support once the Court's prior requirement of truthful, unambiguous representations is met. Finally, producers who choose to include more detailed information concerning the particulars of winemaking are free to do so; some wineries already supply quite extensive information. In this way, plaintiffs and others of refined palate may pay for the privilege without

---

15. *See* 43 Fed.Reg. 37,672–75 (Aug. 23, 1978).

16. Although the cost factor was not relevant to regulations implementing a clear statutory re-

quirement such as the prohibition against deceptive labels, the administrative discretion implicit in judgments of "adequacy" obliges the agency to consider this factor.

burdening the majority of consumers. Such administrative accommodation on the issue of adequacy between the needs of ordinary and sophisticated consumers is entirely appropriate under the Act; in no way is it arbitrary, capricious, or an abuse of discretion. *See National Nutritional Foods Ass'n v. FDA,* 504 F.2d 761, 783 (2d Cir. 1974), *cert. denied,* 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975).

Plaintiffs' motion for summary judgment is hereby granted with respect to the regulation's failure to require truthful and accurate representation of principal varietal designations and appellations of geographic origin, and truthful and accurate identification of wine producers and makers. In all other respects plaintiffs' motion is denied, and defendants' motion on all other aspects of the regulation is granted. The action is hereby remanded to BATF, so that the agency can revise its regulation consistent with the requirements stated at the end of Part I of this Memorandum and Order.

A prompt rulemaking proceeding, conducted with reasonable dispatch pursuant to 5 U.S.C. § 553 is required. Defendants shall report to the Court in writing by April 30, 1980, concerning the status of the remand. The Court retains jurisdiction.

SO ORDERED.