**WJG TELEPHONE COMPANY, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

American Telephone and Telegraph Co., American Waterways Operators, Inc., River Communications, Inc., Waterway Communications System, Inc., Intervenors.

**No. 81–1461.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 28, 1982.

Decided April 9, 1982.

John M. Ballenger, Lubbock, Tex., for petitioner.

Dennis C. Brown, Washington, D. C., with whom Jeremiah Courtney and Jack R. Smith, Washington, D. C., were on the brief, for intervenor, River Communications, Inc.

Michael D. Sullivan, Counsel, F. C. C., Washington, D. C., with whom Stephen A. Sharp, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Barry Grossman and Margaret G. Halpern, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

Martin W. Bercovici, Washington, D. C., with whom Sheila A. Millar, Washington, D. C., was on the brief, for intervenors, American Waterways Operators, Inc. and Waterway Communications System, Inc.

Burton K. Katkin and William V. Catucci, New York City, entered appearances for intervenor, American Tel. and Tel. Co.

Before WALD, MIKVA and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This is a petition for review of a report and order of the Federal Communications Commission (FCC) allocating 80 radio channels to provide integrated, river-wide communications on the Mississippi River and connecting waterways. *Inland Waterways Communications Systems*, 84 F.C.C.2d 875 (1981) (Order). WJG Telephone Company, Inc. (WJG), an operator of an existing public coast station, challenges the FCC's rulemaking as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. River Communications, Inc. (Rivercom), a consortium of existing public coast operators that includes WJG, has in-

tervened in support of WJG. We affirm the FCC's decision to move toward the stated goal of an integrated system.

## I. BACKGROUND

Ship-to-shore communication on the Mississippi River and connecting waterways is now performed by two kinds of maritime radio services,[1] which provide a radio link to the overland telephone network so that ships can make and receive telephone calls. The existing maritime radio service is oriented toward "boating localities" where there are concentrations of vessel activity. *See* 47 C.F.R. §§ 81.3(j) and 81.303(b) (1980). Individual stations need not be interconnected: a caller wishing to reach a particular vessel has to know the general location of the vessel and the nearest public coast station before the call can be completed.[2]

The tugboat, towboat, and barge operators of the Mississippi River system have argued for years that current radio service is inadequate.[3] In 1974, an association of tug and barge operators formed Waterway Communications, Inc. (Watercom) to seek relief from the FCC. In response to Watercom's proposals, the FCC issued a notice of proposed rulemaking that set out for comment three alternative plans for increasing the frequencies available for maritime radio service on the Mississippi River. Notice of Proposed Rulemaking, 45 Fed.Reg. 3064 (Jan. 11, 1980).

After evaluating the comments, the Commission issued its report and order finding

---

1. These are Public Coast Stations, which are common carriers open to the public, and Limited Coast Stations, which are used for private communications only. *See generally* 47 C.F.R. §§ 81.3, 81.351 *et seq.* (1980). WJG, for example, is a public coast station that serves roughly a 350-mile stretch of the Mississippi River from Kentucky to Arkansas.

2. Existing service has additional disadvantages. The numerous public coast stations are independently owned and operated, and calling and billing arrangements differ from station to station. Moreover, FCC regulations require that service be provided manually, using operators, rather than through automatic direct-dialing. WJG has petitioned for rulemaking that would

allow local operators to automate their services, but that petition has not yet been considered by the FCC. *See* Order, 84 F.C.C.2d at 878.

3. The problem was a main topic of discussion at the 1970 annual meeting of the American Waterways Operators (AWO), and led to a proposal in 1974 to construct a prototype system "over approximately 400 miles of the Mississippi and Ohio Rivers." The application was not granted, but AWO and the Maritime Administration of the Commerce Department, which would have partially funded the system, continued to press the issue. *See* Notice of Proposed Rulemaking, 45 Fed.Reg. 3064, 3065 n.3 (Jan. 11, 1980).

the existence of a need for an Inland Waterways Communications System (IWCS) in the Mississippi River system. It allocated 80 frequencies, divided into four groups of 20 channels each, so as to allow up to four competing IWCS operators in a given area.[4] The Commission thus approved the concept of "a fully automated, integrated, interconnected, river-wide, maritime communications system on the Mississippi River System." Order, 84 F.C.C.2d at 875. It then stated that applicants seeking authorization to operate an IWCS should supplement their applications with

> a detailed plan demonstrating that the proposed system will provide continuity of service along a major portion (more than 60%) of one or more navigable waterways encompassing the Mississippi River System ... to be served by the applicant. Waterways covering less than 150 miles long should be served in their entirety.

*Id.* at 900.

The FCC denied petitions for reconsideration in December 1981, *see* 88 F.C.C.2d 678 (1981) (Reconsideration Order), and WJG's petition for review in this court was amended to include review of the second order as well.

## II.   THE ISSUES PRESENTED

WJG and Rivercom make independent objections to the FCC order. WJG first objects to the "60% percent" rule, contending that requiring any proposed IWCS operator to serve a minimum of 60% of one or more navigable waterways is arbitrary and capricious. WJG argues that the FCC has not explained the purpose of this requirement, failed to give notice that a 60% requirement was under consideration, and acted irrationally in drawing the 60% coverage requirement "virtually from its hat." Brief for Petitioner WJG (WJG Brief) at 31.

The naming of rivers is only of historical consequence, and WJG sees no rational basis for the Commission to conclude that individual rivers should be treated as individual commercial units for the purpose of qualifying prospective applicants for authorization to construct an IWCS. *Id.* at 29.

Second, WJG contends that the FCC has failed to consider the anticompetitive impact of its rulemaking on existing public coast stations. It claims, for example, that the 60% rule favors Watercom and will prevent smaller businesses such as WJG from operating a competing IWCS. Finally, WJG urges that the FCC has acted capriciously by failing to "retain jurisdiction in order to prevent or remedy anticompetitive or predatory conduct by the operator or operators of an IWCS." WJG Brief at 39.

Rivercom's objections to the FCC order are more technical. It joins WJG in urging that the Commission failed to consider the anticompetitive effects of its rulemaking, but on two additional grounds. The FCC is said to have acted arbitrarily in failing to adopt an IWCS signalling standard that would allow all IWCS mobile units to transmit and receive signals from any IWCS shore station, and in failing to require that mobile units be capable of compatible operation on all of the 80 channels allocated to IWCS use. Both omissions, Rivercom contends, will give an anticompetitive advantage to the first IWCS licensee by making it unlikely that later entrants can compete for its customers.

## III.   DISCUSSION

■ Although the exact genesis of the 60% coverage requirement is unclear, we cannot say the FCC's adoption of this requirement was arbitrary or capricious. It is true that an agency may not pluck a number out of thin air when it promulgates rules in which percentage terms play a crit-

---

**4.** There is nothing sacrosanct about these numbers; the FCC could allow more IWCS systems using fewer channels each, or fewer systems using more channels. Brief for Respondent FCC at 5. In some places along the river sys-

tem, however, the allocated frequencies may experience interference from television channel 13, thus requiring that not all of the 80 channels be used. *See* Order, 84 F.C.C.2d at 893–94.

ical role. *See, e.g., San Antonio, Texas v. United States*, 631 F.2d 831, 852 (D.C.Cir. 1980) (7% additive above full costs set aside because figure used with no supporting rationale or justification). When a line has to be drawn, however, the Commission is authorized to make a "rational legislative-type judgment," *FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 814, 98 S.Ct. 2096, 2121–2122, 56 L.Ed.2d 697 (1978). If the figure selected by the agency reflects its informed discretion, and is neither patently unreasonable nor "a dictate of unbridled whim," then the agency's decision adequately satisfies the standard of review. *Stereo Broadcasters, Inc. v. FCC*, 652 F.2d 1026, 1031 (D.C.Cir.1981); *see Wawszkiewicz v. Department of the Treasury*, 670 F.2d 296, 302–303 (D.C.Cir.1981) (affirming agency's selection of a 75 percent varietal grape content for wine).

The 60% coverage requirement adopted by the FCC clearly reflected its conflicting desires that IWCS operators provide continuous, "river-wide" service, and that competition between IWCS operators not be precluded by requiring such broad coverage of the river system that financially weaker organizations would be unable to enter the market. The Commission reasonably compromised these aims by inviting license applications for systems that would cover "a major portion" of one or more waterways; the 60% figure was a reasonable attempt to quantify this term. Moreover, in denying WJG's petition for reconsideration, the Commission responded fully to complaints that the 60% requirement was arbitrary, and has adequately explained its reasons for adopting that requirement.[5]

It is absurd for WJG to suggest that it has been prejudiced by any lack of notice that a 60% coverage requirement was under consideration. The function of notice and comment rulemaking is to give interested parties "an opportunity to participate" in the rulemaking process, *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 758, 92 S.Ct. 1941, 1951, 32 L.Ed.2d 453 (1972), and inadequate notice may raise serious questions about the agency's decision-making. *See, e.g.,* 5 U.S.C. § 553(b) (requirement that agency state terms or substance of proposed rule or description of subjects and issues involved); *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1027–28 (D.C.Cir.1978). But when the agency promulgates a final rule that departs from the precise wording of the proposed rule, this may simply demonstrate that the parties have been effective in influencing the agency's analysis, the very result contemplated by notice and comment rulemaking. "It is clear that an administrative rule as adopted need not be identical to the proposed version of the rule." *Chrysler Corp. v. Dep't of Transportation*, 515 F.2d 1053, 1061 (6th Cir. 1975). Notice is sufficient "if it affords interested parties a reasonable opportunity to participate in the rulemaking process," *Forester v. Consumer Product Safety Comm'n*, 559 F.2d 774, 787 (D.C.Cir. 1977), and if the parties have not been "deprived of the opportunity to present relevant information by lack of notice that the issue was there." *Chicago v. FPC*, 458 F.2d 731, 748 (D.C.Cir.1971), *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972).

These standards were clearly met in this case. The very concept of "a fully automated, integrated, interconnected, river-wide, maritime communications system" implies a coverage requirement of 100% of the waterway. A proposed 100% coverage requirement was implicit in the FCC's Notice of Proposed Rulemaking,[6] and in the

---

**5.** Reconsideration Order, 88 F.C.C.2d at 695–97. The Commission explained:
   Rather than require an applicant to demonstrate its proposed system would provide continuity of service over an entire waterway, the Commission felt that such a showing for service along a major portion of a navigable waterway would be sufficient to ensure that an integrated network serving

the Mississippi River System were established. The 60% figure was considered the minimum "major portion" of a waterway that would fulfill this enunciated intent. *Id.* at 696.

**6.** The Notice explained that "[t]he system we are proposing should have most, if not all of

problems caused by localized coverage to which that notice responded. Rivercom's comments during the rulemaking emphatically opposed "connecting stations over a total distance of 3,000 miles," and urged the Commission to leave the development and extent of a network to the marketplace. Rivercom Comments, April 7, 1980, at 9, 15, Joint Appendix (J.A.) 116, 122. Watercom, on the other hand, urged that an IWCS should "provide continuous communications coverage on a navigational system-wide basis." Watercom Comments, April 7, 1980, at ii, J.A. 140. The FCC considered and rejected "a regional approach" in favor of the "integrated system approach" that it had first proposed. Order, 84 F.C.C.2d at 890. Any genuine "surprise" at the announcement of the 60% figure would have been that it was unexpectedly low, not high. *See* Watercom Opposition to Petitions for Reconsideration, May 14, 1981, at 13, J.A. 352; Reconsideration Order, 88 F.C.C.2d at 693–94. The 60% coverage requirement was not selected arbitrarily, but was an informed attempt by the Commission to maximize promotion of the public interest.[7]

■ We also conclude that it was neither arbitrary nor an abdication of its statutory

duty for the FCC to decline suggestions that it mandate a common signalling standard for all IWCS operators. Rivercom had proposed a signalling format known as Secode. Watercom did not oppose a uniform standard, but preferred a format known as Selcall. The first format is slower, but the equipment is widely available; the second format has distinct advantages, but the equipment is not yet on the shelf. The FCC initially contemplated issuing "uniform standards," although it noted that "standardization at this time may be undesirable in that it may stifle innovation, freeze technology, and limit the flexibility of equipment and system designers." Notice of Proposed Rulemaking, 45 Fed.Reg. at 3069. A majority of the comments received by the FCC urged that it not adopt specific technical standards "at this time," and the Commission agreed that it was premature to compel future IWCS operators to employ a specific signalling methodology rather than leaving them free to exercise business judgment. Order, 84 F.C.C.2d at 896–97. This decision was not unreasonable, especially as there is no suggestion that the FCC will ignore questions of system compatibility as IWCS operators are licensed in the future.[8]

the following characteristics," including the following:

It should provide continuous communications river-wide. To provide the last capability shore stations will be required to be fully interconnected.

45 Fed.Reg. at 3068 (Jan. 11, 1980). In serving notice that such a system was under consideration, the FCC also rejected two pending petitions of Watercom including one that would have reallocated underutilized frequencies "in the areas of New Orleans and the lower Mississippi River." This petition was rejected because reallocating these frequencies would have displaced a large number of land mobile licensees, and because the New Orleans area "constitutes about 5% of the Mississippi River waterway between South Pass and the Chicago locks. *Consequently, we would not have provided a solution for 95% of this waterway.*" *Id.* at 3066 (emphasis added).

7. We also agree that the FCC's exception for rivers of less than 150 miles in length was not unreasonable. The Mississippi River system had been defined to include at least 30 tributaries, and the Commission realized that the canal now under construction to connect the Tennessee and Tombigbee Rivers will on completion

add at least 4 more. The FCC explained that because "relatively small rivers could be served by two or three shore stations, no need was seen to provide a lesser standard" than 100% coverage. Reconsideration Order, 88 F.C.C.2d at 696.

WJG's strongest attack on the 60% rule concerned the Mississippi River itself. WJG argued that the Coast Guard, Corps of Civil Engineers, and the barge and towing industry consider the Lower and Upper Mississippi Rivers separate commercial units, as demonstrated by such factors as mile markers, navigational season, and the horsepower and towline lengths of towboats. During oral argument, however, counsel for the FCC stated that the Commission's staff share this view. The 60% coverage requirement thus applies separately to the Upper and Lower Mississippi Rivers, from their northern and southern endpoints to the midpoint at Cairo, Illinois.

8. Rivercom emphasizes Section 322 of the Communications Act, 47 U.S.C. § 322 (1976), which requires that land stations "be bound to exchange radio communications or signals with any ship" as sea, "without distinction as to radio systems or instruments adopted by each

Similarly, it is premature to suggest that the FCC's decision not to require all-channel mobile units will give any IWCS operator monopoly power. The FCC left the selection of channel capability to users, who presumably will buy or lease units that best fit their specific needs. Moreover, the FCC adds that "when the IWCS service has sufficiently matured we may revisit this matter if the public interest so dictates." Reconsideration Order, 88 F.C.C.2d at 692.

Finally, we cannot agree that the FCC has failed in any way to consider the importance of competition in IWCS operations. It originally contemplated allocating only 14 channels, which probably would have been enough for only one system, but eventually increased that allocation so as to allow as many as four systems. The Commission has the power and the duty to watch for anticompetitive effects, but the time to challenge those effects is when "the extent of the impact on competition becomes more readily assessable." *National Ass'n of Regulatory Utility Commissioners v. FCC*, 525 F.2d 630, 639 (D.C.Cir.), *cert. denied*, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976). Indeed, the more serious questions of this nature were avoided by the FCC when it rejected the suggestions of several operators that it award some form of preference in IWCS licensing to existing operators. *See* Rivercom Comments, April 7, 1980, at 2–3, 5, J.A. 109–10, 112. The way is clear for WJG and other members of Rivercom to pool their resources and compete with Watercom or any other potential IWCS operator. We cannot say the FCC has acted arbitrarily or ignored considerations of the public interest simply because it has authorized a new form of maritime radio service that may compete vigorously with existing public coast stations.[9]

### CONCLUSION

It sometimes seems inevitable that any effort by a regulatory agency to authorize improved service in the regulated industry immediately brings sharp protest from existing businesses. When the agency's action is irrational, arbitrary, or not in accordance with law, of course, courts must set aside that action no matter how well intentioned it is. But if the agency's action is reasonable, lawful, and fully considered, courts have an obligation to respect the agency's policy. The FCC order authorizing Inland Waterways Communications Systems meets this test. The decisions to allow system development over "major portions" of one or more waterways, and to leave questions about equipment and signalling standards at least initially to the business judgment of IWCS operators, were neither arbitrary nor capricious. The petitions for review are denied.

*It is so ordered.*

---

station." The statute was enacted to remedy dangerous and anticompetitive practices during the early days of radio, when, for example, stations owned by Marconi might refuse to respond to calls from vessels equipped with RCA radio equipment. The FCC contends that this statute applies only to vessels "at sea," and not ships on inland waterways. We do not reach this question because it is clearly premature.

9. The FCC specifically encouraged existing public coast stations to compete with IWCS operators in terms of "price, quality and diversity of service." Order, 84 F.C.C.2d at 890–91. It has been estimated, for example, that a three minute call costs from $1 to $3 plus tolls when placed by existing public coast stations, but that an IWCS will have to charge from $8 to $10 plus tolls for a similar call. Rivercom Reply Comments, May 7, 1980, at 5 & n.*, J.A. 306 & n.*.